IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  24-cr-0251-RMR

UNITED STATES OF AMERICA,

          Plaintiff,

v.

1. RONALD KING,
2. VICTOR ROITER,
3. TINA WELLMAN,
4. ADAM SHORR,
5. ROBERT O'SULLIVAN,
6. BRADLEY EDSON, and
7. JOHN GAUTEREAUX,

          Defendants.

_____

**INDICTMENT**
_____

The Grand Jury charges:

**COUNT 1**
**(18 U.S.C. § 1349)**

At all times material to this Indictment:

**The Medicare Program**

1.     The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services

("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.      Medicare covered different types of benefits and was separated into different program parts. Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.      Medicare providers included independent clinical laboratories, physicians, and other health care providers who provided items and services to Medicare beneficiaries. To submit claims for reimbursement to Medicare, a provider was required to submit a Medicare Enrollment Application Form to Medicare. The application contained certifications that the provider was required to make before the provider could enroll. Specifically, the application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5.      A Medicare provider number was assigned to a provider upon approval of the provider's application. A health care provider that received a Medicare provider number was able to submit claims with Medicare to obtain reimbursement for services provided to beneficiaries.

6.      A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) the billing codes for the benefit, item, or service provided or supplied to the beneficiary (referred to as Current Procedural Terminology, or CPT, codes); (c) diagnosis codes (referred to as ICD-10 codes); (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

7.      When submitting claims to Medicare for reimbursement, providers were required to certify that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services that were purportedly provided, as set forth in the claims, were medically necessary.

8.      Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

9.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service. Novitas Solutions Inc. and Palmetto GBA were MACs.

10.      Payments under Medicare Part B were often made directly to the health care provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

**The Colorado Medicaid Program**

11.      The Medicaid Program ("Medicaid") provided health coverage to low-income adults, children, pregnant women, elderly adults, and people with disabilities. Medicaid was a federal and state funded health care program administered by states, according to federal requirements.

12.      Colorado Medicaid was a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f), and a "health care benefit program," as defined by Title 18, United States Code, Section § 24(b).

13.      The benefits available under Medicaid were governed by federal statutes and regulations, and by rules implemented by the individual states. Individuals who

4

received benefits under Medicaid were commonly referred to as Medicaid "beneficiaries."

14.    The State of Colorado, acting through the Department of Healthcare Policy and Finance, administered the Colorado Medicaid Program, Health First Colorado (hereinafter "Colorado Medicaid").

15.    A Medicaid claim was required to contain certain important information, including: (a) the beneficiary's name and Member ID number; (b) the billing codes for the benefit, item, or service (CPT codes); (d) diagnosis codes (ICD-10 codes); (e) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (f) the name of the provider; and (g) the provider's NPI. The claim form could be submitted electronically.

**<u>Coverage for Genetic Testing</u>**

16.    Genetic testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of diseases in the future. There were different types of genetic testing, such as cancer genetic testing (referred to as "CGx"), cardiovascular genetic testing, pharmacogenomic testing (referred to as "PGx"), and others. Genetic testing was not a method of diagnosing whether an individual presently had a certain medical condition or disease.

17.    To complete a genetic test, the patient typically provided a cheek swab (buccal swab) containing DNA material. Tests were then run for different "panels" of genes identified by the clinical laboratory. Genetic testing typically involved multiple lab

procedures that resulted in billing Medicare using multiple CPT codes, each with its own reimbursement rate.

18.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § I395y(a)(I)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

19.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. The regulations provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

20.     The Colorado Medicaid rules required covered services to be medically necessary, stating "[m]edical necessity means that a Medical Assistance program, good, or service is not primarily for the economic benefit of the provider or primarily for the

convenience of the client, caretaker, or provider and is provided in accordance with generally accepted professional standards for health care in the United States." 10 Colo. Code Regs. § 2505-10:8.076.8.

21.    Under Colorado Medicaid, laboratory services were a covered benefit only if specific conditions were met, including the following: (1) the services were authorized by a licensed physician, (2) the services were performed to diagnose conditions and illnesses with specific symptoms, (3) the services were performed to prevent or treat conditions that were benefits under the Colorado Medicaid program, and (4) the services were not routine diagnostic tests performed without apparent relationship to treatment or diagnosis for a specific illness, symptom, complaint or injury. 10 Colo. Code. Regs. § 2505-10:8.660.3.A(1)–(4).

**The Defendants, Related Entities, and Relevant Persons**

22.    Tesis Labs LLC, also known as Tesis Biosciences LLC ("Tesis"), was a limited liability company formed under the laws of Delaware in or around October 2019.

23.    Tesis, through various entities, owned and operated four independent clinical laboratories at times throughout the conspiracy charged. Claro Scientific Laboratories, Inc. ("Claro") was a corporation formed under the laws of Delaware with its principal place of business in Lafayette, Colorado. Claro was an independent clinical laboratory enrolled with Medicare. Tesis acquired the laboratory in or around January 2020. Alliance DX, LLC ("Alliance") was a limited liability company formed under the laws of Texas with its principal place of business in Texas. Alliance was an independent clinical laboratory enrolled with Medicare. Tesis acquired the laboratory in or around

November 2020. 303 Diagnostics, LLC ("303 Diagnostics") was a limited liability company formed under the laws of Colorado with its principal place of business in Colorado. Tesis acquired 303 Diagnostics in or around December 2020, when it was located in Denver, Colorado. 303 Diagnostics was an independent clinical laboratory enrolled with Medicare. In or around October 2021, the lab established a principal place of business in Aurora, Colorado. The three foregoing laboratories are, hereinafter, the "Tesis Laboratories." Tesis Labs of Arizona LLC ("Tesis Arizona") was an independent clinical laboratory that, among other things, was used to perform genetic testing for which other third-party laboratories would bill Federal health care programs. Tesis Arizona was established in or around October 2021 with its principal place of business in Arizona.

24.    Defendant RONALD KING was the CEO of Tesis and a beneficial owner of Tesis through an entity he controlled, Vytal Healthcare Solutions, which was a Member of the limited liability company. RONALD KING was also associated with and provided direction to the billing company ("Billing Company") Tesis hired to "map" its genetic testing panels, review its claims to maximize reimbursement from Medicare and Medicaid, train its marketers on "medical necessity," and submit claims to Medicare and Medicaid, among other tasks.

25.    VICTOR ROITER was a beneficial owner of Tesis through an entity he controlled, Redstone Consulting, LLC, which was a Member of the limited liability company. VICTOR ROITER was identified as the Vice President of Marketing for Tesis, and he signed Medicare paperwork for Claro on which he was identified as "owner."

26.     Defendant TINA WELLMAN was a beneficial owner of Tesis through an entity she controlled, Valley Vantage Consulting, LLC, which was a Member of the limited liability company. At times, WELLMAN was identified as the Chief Operating Officer of Tesis. TINA WELLMAN was also the CEO and owner of the Billing Company, which had a principal place of business in New York.

27.     Defendant ADAM SHORR was a beneficial owner of Tesis through an entity he controlled, A&E Czech Enterprises, LLC, which was a Member of the limited liability company. He also agreed to be a "Business Consultant" for Tesis, and he worked with call centers and "marketing" groups that contracted with the Tesis Laboratories.

28.     Autumn Partnership LLC ("Autumn Partnership") was a company that RONALD KING, VICTOR ROITER, TINA WELLMAN, ADAM SHORR, JOHN GAUTEREAUX, and ROBERT O'SULLIVAN used in late 2019 and early 2020 as a "proof of concept" for the Tesis business model.

**The Conspiracy**

29.     Between in or around January 2020, and continuing through at least December 2022, in the state and District of Colorado and elsewhere, defendants RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR, did knowingly and voluntarily conspire and agree together and with each other to commit offenses against the laws of the United States, that is:

a.      to knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by

9

means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

b.    to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Colorado Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

**Manner and Means of the Conspiracy**

30.    Acting interdependently, defendants RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR, carried out the conspiracy using the following manner and means, among others:

31.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR agreed to work together to acquire and operate Medicare-enrolled independent clinical laboratories to bill for and obtain payment for genetic testing. The co-conspirators

agreed that Tesis Labs, LLC, later renamed Tesis Biosciences LLC ("Tesis"), an entity they had participated in establishing in or around October 2019, would own the laboratories.

32.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR held beneficial ownership interests in Tesis through entities each controlled, which entities were members of the limited liability company.  The co-conspirators and others agreed to build revenue from genetic testing to a sufficient level to sell Tesis or to take the company public and to profit therefrom.

33.    VICTOR ROITER, RONALD KING, and TINA WELLMAN agreed to and provided administrative services to "manage the day-to-day operations" of the Tesis Laboratories, including through Billing Company. RONALD KING agreed to be the Chief Executive Officer, TINA WELLMAN agreed to be the Chief Operating Officer, and VICTOR ROITER agreed to be the Vice President of Marketing.

34.    ADAM SHORR, through A&E Czech Enterprises LLC, an entity he controlled, agreed to act as a "business consultant" for Tesis in exchange for issuance to his entity of Series B units of the company's membership interests.

35.    To generate payments for genetic testing from Federal health care programs, RONALD KING, VICTOR ROITER, TINA WELLMAN, ADAM SHORR, and others known to the grand jury agreed to offer and cause the payment of kickbacks and bribes to individuals (identified as "marketers"), including via interstate wire communication, to induce the referral to the Tesis Laboratories of beneficiaries for genetic testing and in exchange for arranging for doctors' orders for genetic testing,

without regard to the medical necessity of the genetic testing, or whether the tests were eligible for Medicare or Medicaid reimbursement. The co-conspirators agreed to pay these individuals based on the volume and value of the anticipated reimbursement by Medicare and Medicaid for the tests, negotiating payment based on the number and type of tests the marketer committed to send to the Tesis Laboratories each month.

36.    The co-conspirators concealed and disguised the nature and source of these kickbacks and bribes through sham invoices and contracts, including by describing them as payments for purportedly legitimate "marketing and business services" that the co-conspirators did not intend for the marketers to perform and that the marketers did not perform. This kickback model was based, in part, on the model used at Autumn Partnership—the "test case" or "proof of concept" for Tesis. The co-conspirators caused the Tesis Laboratories to enter into sham contracts with more than thirty marketers to conceal their kickback relationships. ADAM SHORR and RONALD KING caused at least four marketing companies to create sham invoices to conceal their kickback relationships.

37.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR agreed to pay and caused the payment of marketers for referrals with doctors' orders for genetic tests they knew were not medically necessary and knowingly caused the submission of fraudulent claims to Medicare and Medicaid on the basis of those orders.

38.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR agreed to pay marketers they knew would target Federal health care program beneficiaries—mainly the elderly who were likely to be Medicare beneficiaries—by using

telemarketers at call centers to solicit and induce the beneficiaries to accept genetic tests regardless of medical necessity and through false pretenses and representations.

39.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR directed and caused marketers to use telemedicine companies they approved to obtain doctors' orders for medically unnecessary genetic tests. These telemedicine providers used personal health information solicited by telemarketers from the beneficiary and a brief telephonic call with the beneficiary as the basis for signing the test requisition form (the doctor's order). These providers never examined the beneficiaries, typically spoke to each beneficiary for only a few minutes, relied on beneficiaries' self-reported medical information solicited by telemarketers, did not treat or diagnose the beneficiaries with any medical conditions, and did not intend to and did not use the genetic test results to treat or diagnose the beneficiaries. The tests were ordered primarily for the economic benefit of the co-conspirators and their associates. The co-conspirators knew that the marketing companies paid the telehealth companies on a per-patient basis for the orders.

40.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR also procured and paid marketing companies to obtain doctors' orders for medically unnecessary genetic tests through a process they referred to as "doctor chase," by which the marketer's call center representatives induced the beneficiary to identify their primary care physician, and the marketer "chased" the physician and made false and fraudulent representations to induce the physician to sign off on prepopulated requisition forms transmitted to the doctors' offices.

41.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR caused marketers falsely and fraudulently to identify or obtain the identification on doctors' orders of diagnosis codes (ICD-10 codes) that the Billing Company had identified as superficially adequate to justify the "medical necessity" of the tests on paper. The co-conspirators used "medical necessity training" for the marketers and a "rejection" and "correction" process to obtain doctors' orders that would enable and maximize reimbursement. The co-conspirators, through laboratory employees and through Billing Company representatives located in India, caused marketers to "correct" doctors' orders that the Billing Company "rejected" as having insufficient diagnosis codes to obtain high enough reimbursement by adding or changing diagnosis codes.

42.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR tracked and caused Tesis and Billing Company employees to track the number and type of referrals each marketing company submitted and to share this information with the marketers to ensure the marketers met their monthly referral numbers. The co-conspirators used the number of "accepted" samples for each marketer in determining amount and timing of payment and contract status, including whether to terminate a marketer or to offer the marketer a second contract with a different Tesis laboratory to compensate them for an increased number of referrals.

43.    RONALD KING, TINA WELLMAN, and others established an operation they referred to as the "call center" in New York to make direct contact with the elderly to solicit their participation in genetic testing for which they could submit claims to Medicare and others through the Tesis Laboratories. VICTOR ROITER and his co-

conspirators also attempted, through the conspiracy, to acquire a call center to save money on the cost of obtaining referrals and doctors' orders and to maximize their fraudulent proceeds.

44.     RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR caused genetic samples with doctors' orders to be shipped to the laboratories in Colorado and Texas.

45.     When Claro began submitting claims to Medicare for reimbursement for genetic tests in 2020, Claro did not have the ability to conduct any genetic testing. Until Claro developed the capability to run its own genetic testing, Claro paid reference labs a set fee per test to run the genetic tests while Claro submitted the claims to Medicare for the tests.

46.     Throughout the conspiracy, RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR caused the submission, through the Tesis Laboratories, of false and fraudulent claims to Medicare and Medicaid, including via interstate wire communication, for genetic tests that were: (a) induced through kickbacks and bribes in violation of the Anti-Kickback Statute; (b) not medically necessary; (c) not eligible for reimbursement; and (d) ordered by doctors who did not have a pre-existing doctor-patient relationship with the beneficiaries, were not treating the beneficiaries, did not conduct a physical examination, and/or would not use the genetic testing in the diagnosis or treatment of the beneficiary.

47.     RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR submitted, and caused the submission of, false and fraudulent claims to Medicare and

Colorado Medicaid, including through the use of interstate wire communication, on behalf of the Tesis Laboratories, totaling approximately $60 million for laboratory services that were not medically necessary and not eligible for reimbursement. The Tesis Laboratories received payments for these claims of more than $40 million.

48.    RONALD KING participated in soliciting and receiving money from investors to further and perpetuate the scheme, including to pay marketers.

49.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR, and others agreed to have Tesis Arizona begin to offer services as a reference laboratory. Knowing that a third-party laboratory would bill Medicare for medically unnecessary genetic tests, in or around May 2022, the co-conspirators agreed to have Tesis Arizona perform the testing for which the third-party, Laboratory A, would submit claims, in exchange for payment for the testing. TINA WELLMAN through Billing Company submitted claims for reimbursement for the genetic tests for Laboratory A. The co-conspirators thus caused and enabled fraudulent billing by reference client Laboratory A, to Medicare, including through the use of interstate wire communication, on behalf of Laboratory A for tests completed by Tesis Arizona, totaling over $500,000 for laboratory services that were not medically necessary and not eligible for reimbursement. As a result of these false and fraudulent claims, Laboratory A received payments from Medicare totaling over $500,000.

50.    RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR used the fraudulent proceeds received from Medicare and Medicaid and from investors

in the fraudulent business model to benefit themselves and others and to further the fraud.

The foregoing is in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### (18 U.S.C. § 371)

51.     Paragraphs 2, 12, 22 through 28, and 42 are re-alleged and incorporated by reference as though fully set forth herein.

52.     Defendant ROBERT O'SULLIVAN was a beneficial owner of Tesis through Quant BPO, LLC, which was a Member of the Tesis limited liability company. O'SULLIVAN was a beneficial owner of Quant BPO, LLC through an entity he controlled, FAM Enterprises LLC.

53.     Defendant BRADLEY EDSON was a beneficial owner of Tesis through entities that were Members of the Tesis limited liability company.

54.     Defendant JOHN GAUTEREAUX was a beneficial owner of Tesis through Quant BPO, LLC, which was as a Member of the limited liability company. JOHN GAUTEREAUX was a beneficial owner of Quant BPO, LLC through an entity in which he was a member.

55.     Commercial health insurers, such as United Health Care, Aetna, and Humana, were health care benefit programs as defined in Title 18, United States Code, Section 220(e)(3).

56.     Between not later than January 2020 and continuing through at least December 2022, in the State and District of Colorado and elsewhere, the defendants, RONALD KING, VICTOR ROITER, TINA WELLMAN, ADAM SHORR, ROBERT

17

O'SULLIVAN, BRADLEY EDSON, and JOHN GAUTEREAUX, did knowingly and

voluntarily, with the intent to further the objects of the conspiracy, combine, conspire,

confederate, and agree with each other and with others known and unknown to the

grand jury, to commit offenses against the laws of the United States, that is:

a.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by

knowingly and willfully offering and paying any remuneration, including kickbacks

and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a

person to induce such person to refer an individual to a person for the furnishing

and arranging for the furnishing of any item and service for which payment may

be made in whole or in part under a Federal health care program, that is,

Medicare and Colorado Medicaid; and

b.      to violate Title 18, United States Code, Section 220(a)(2)(A), by knowingly

and willfully offering and paying remuneration, including any kickback, bribe, or

rebate, directly and indirectly, overtly and covertly, in cash and in kind, to induce

a referral of an individual to a laboratory, with respect to services covered by a

health care benefit program in and affecting interstate commerce.

**Manner and Means of the Conspiracy**

57.      Acting interdependently, the defendants, RONALD KING, VICTOR

ROITER, TINA WELLMAN, ADAM SHORR, ROBERT O'SULLIVAN, BRADLEY

EDSON, and JOHN GAUTEREAUX, carried out the conspiracy using the manner and

means described below.

18

58.     To generate payments for genetic testing from Federal health care programs and commercial health insurers to the Tesis Laboratories, the co-conspirators agreed to offer and cause the payment of kickbacks and bribes to individuals (identified as "marketers"), to induce the referral to the Tesis Laboratories of beneficiaries for genetic testing and in exchange for arranging for doctors' orders for genetic testing. The co-conspirators agreed that the Tesis Laboratories would pay these individuals based on the volume and value of the anticipated reimbursement by Medicare, Medicaid, and commercial health insurers for the tests, negotiating payment based on the number and type of tests the marketer committed to send to the Tesis Laboratories each month and the expected reimbursement for those tests.

59.     The co-conspirators concealed and disguised the nature and source of the kickbacks and bribes through sham invoices and contracts, including by describing them as payments for purportedly legitimate "marketing and business services" that the co-conspirators did not intend for the marketers to perform and that the marketers did not perform. This kickback model was based, in part, on the model used at Autumn Partnership.

60.     RONALD KING, VICTOR ROITER, TINA WELLMAN, and ADAM SHORR caused the Tesis Laboratories to enter into sham contracts with more than thirty marketers to conceal their kickback relationships. ADAM SHORR and RONALD KING caused at least four marketing companies to create sham invoices to conceal their kickback relationships.

61.    RONALD KING, VICTOR ROITER, TINA WELLMAN, ADAM SHORR, and ROBERT O'SULLIVAN, tracked and caused Tesis and Billing Company employees to track the number and type of referrals each marketing company submitted to the Tesis Laboratories and to share this information with the marketers to ensure the marketers met their monthly referral numbers. The co-conspirators used the number of "accepted" samples for each marketer in determining the amount and timing of payment and contract status, including whether to terminate a marketer or to offer the marketer a second contract with a different Tesis laboratory to compensate them for an increased number of referrals.

62.    The defendants caused the payment of millions of dollars in kickbacks and bribes to marketing companies for the referrals.

**Overt Acts**

63.    In furtherance of the conspiracy's objectives, one or more of the co-conspirators committed one or more of the following acts in the State and District of Colorado and elsewhere.

64.    On or about January 31, 2020, VICTOR ROITER directed Individual E via text message that Claro was ready to take samples and that payment was "40% of net for 90 days then we go to a flat rate."

65.    On or about February 8, 2020, VICTOR ROITER met with Individual A in person in Colorado to discuss Individual A using his company, Marketing Company A, to refer beneficiaries with doctors' orders for genetic tests to Claro.

66.     On or about February 18, 2020, RONALD KING sent a draft marketing contract to TINA WELLMAN, VICTOR ROITER, and JOHN GAUTEREAUX, providing for payment for services based on invoices submitted at a per-hour rate.

67.     On or about March 20, 2020, TINA WELLMAN e-mailed ADAM SHORR "Re: Todd and Danny agreement," attaching the "marketing agreement" for marketing group Sunrise Consulting LLC, which provided that Claro would pay the marketing company $100,000 per month for "marketing and business services."

68.     On or about March 23, 2020, VICTOR ROITER caused a Claro employee located in Colorado to draft a "Marketing Business Services Agreement" for Marketing Company A located in Colorado, which the employee e-mailed from Colorado to RONALD KING, VICTOR ROITER, and TINA WELLMAN.

69.     On or about April 1, 2020, VICTOR ROITER texted Individual B, "Let me know who am I making the agreement out to? Company name? Or individual / Address / And how many samples do you think you want to start with? Modality? Cardiac? CGX? Etc."

70.     On or about April 7, 2020, RONALD KING e-mailed JOHN GAUTEREAUX, TINA WELLMAN, and another attaching a "draft [s]ales agreement for your reference and edits" and stated, "We should nail down an agreement on the high performers as we discussed to get them starting conversations."

71.     On or about April 7, 2020, RONALD KING e-mailed JOHN GAUTEREAUX and TINA WELLMAN and asked, "When do you feel there will be draft agreements to review from the reps on their commitments to volume and test modalities etc?"

72.     On or about April 8, 2020, RONALD KING e-mailed a Tesis employee and TINA WELLMAN, copying VICTOR ROITER, stating, "See fully executed agreement attached for [Individual B]. Please send to [Individual B] and place in Basecamp." The attached "Marketing Business Services Agreement" between Claro and Marketing Company B-2, signed by VICTOR ROITER, falsely represented that Marketing Company B-2 would provide "marketing and business services" for a purported flat rate of $60,000 per month.

73.     On or about June 16, 2020, RONALD KING e-mailed VICTOR ROITER, ADAM SHORR, TINA WELLMAN, ROBERT O'SULLIVAN, JOHN GAUTEREAUX, BRADLEY EDSON, and another stating, "Just as a follow up to our discussion earlier, we put together a projection by July 15th to have the following volume delivered into the Lab based on flat rate contracts," followed by a table listing marketers and "Volume" for each.

74.     On or about July 23, 2020, ADAM SHORR forwarded messages from Individual C to RONALD KING via WhatsApp that included a document titled "Monthly Swab Count as of 7-22-20.pdf" and a message stating, "I figured roughly 146k owed to me for tomorrow payout minus 38,500 / Leaves 107,500 due to me / All corrections will be fixed by tomorrow."

75.     On or about July 24, 2020, RONALD KING e-mailed BRADLEY EDSON stating, "I have approved 2 wires that require sign off today," and listed "[Individual C] 100k."

76.    On or about September 1, 2020, as reflected in minutes of an executive meeting involving RONALD KING, TINA WELLMAN, VICTOR ROITER, ADAM SHORR, ROBERT O'SULLIVAN, BRADLEY EDSON, JOHN GAUTEREAUX, and another, RONALD KING reported that "Everyone hit their marketing quote for the month by the third week." RONALD KING also requested of the group to "Please ensure that all contracts are in place before payment is made so that we ensure compliance during audits."

77.    On or about September 4, 2020, RONALD KING texted BRADLEY EDSON that he approved "4 wires for marketing services in August" and listed the marketing group and amount of the payment to each. BRADLEY EDSON responded, "I will get them approved in next 20 minutes / Those are some large wires. Hopefully they'll perform according to expectations." RONALD KING explained, "Yes. The volume is already in the lab."

78.    On or about September 13, 2020, VICTOR ROITER e-mailed RONALD KING stating, "We need to do an addendum to Fabian Espinosa agreement. His company is Lettus works LLC. He wants to increase vume [sic] from 50 to 150. The total monthly contract would be $ 180,000."

79.    On or about October 27, 2020, RONALD KING forwarded a Tesis employee who processed payments to marketers an e-mail from Individual D attaching an invoice dated October 31, 2020, for "Advertising and Marketing Services," "Payroll," "Rent," and "Salary and Wages" totaling $144,000.

80.    On or about October 30, 2020, RONALD KING caused to be issued a payment of $144,000 to Individual D at FirstBank in Colorado for "marketing services."

81.    On or about November 1, 2020, VICTOR ROITER e-mailed RONALD KING "the numbers for [Marketer D].... Total samples 245 Montana 43 Colorado 202[.] So not even close to half."

82.    On or about November 19, 2020, ROBERT O'SULLIVAN texted RONALD KING, "Am I reading this right that if he [marketer] delivers, his company will receive $8mm in payments?" RONALD KING responded, "If he delivers. So 800k for you."

83.    On or about January 19, 2021, RONALD KING texted ROBERT O'SULLIVAN regarding a marketer and stated, "He's not understanding the main point which is he's not driving volume in yet. We need to move him to a TX agreement. Just cancel the claro agreement is my suggestion." ROBERT O'SULLIVAN responded, "...[H]e should be good volume so he should be willing to cancel and then restart with a realistic volume with that group[.] That resets the number...."

84.    On or about March 7, 2021, BRADLEY EDSON e-mailed RONALD KING regarding contract negotiations with a marketing group. He was responding to an e-mail from the marketing group to RONALD KING in which the marketer said that "the contract is too low (from a volume standpoint) and we will hit the year end numbers within the first 60 days. We would like to (before this contract is implemented – monetized), to go back to the original schedule as proposed by Ron." RONALD KING forwarded this e-mail to BRADLEY EDSON, who responded, "I am completely OK with increasing the volume if you feel comfortable with that ...."

85.     On or about April 13, 2021, Individual E texted VICTOR ROITER regarding a contract with a marketer. VICTOR ROITER asked Individual E to "confirm 100 or 200" tests per month, and he responded, "200 at 1200."

86.     On or about May 19, 2021, ROBERT O'SULLIVAN forwarded to RONALD KING a marketer agreement and e-mail describing the agreement as "based on the 35 samples/month with an even split between Cardio & PGx" and requested his review.

87.     On or about April 21, 2021, RONALD KING spoke to BRADLEY EDSON telephonically and explained that the contract for Marketing Company F was for 1500 samples per month at approximately $1700 per sample, and that VICTOR ROITER had "negotiated verbally" with the marketer and "if they did not bring the volume or the marketing efforts did not yield the revenue needed, we just make a change, we just terminate."

88.     On or about April 27, 2021, BRADLEY EDSON e-mailed RONALD KING regarding the contract for Marketing Company F, which they had discussed on April 21, 2021, stating: "I think the contract as written, if approved by your legal counsel, is fine with me. I know you don't need me to say this, but please monitor the situation closely to make sure all 'expectations' are met as it proceeds."

89.     On or about August 5, 2021, BRADLEY EDSON e-mailed RONALD KING to inform him that wires KING had requested for thirteen marketing groups had been approved, including for Marketing Company F.

90.     On or about August 5, 2021, RONALD KING spoke with ROBERT O'SULLIVAN on the phone and advised him regarding communications with marketers

regarding volume. KING told O'SULLIVAN to tell a marketer not to "put anything in writing anymore based on volume," but that O'SULLIVAN could bring the contractor on, and they would "just basically back into it." KING further stated:

> I saw your email on, uh, bringing [marketer] onboard. The only reason I didn't respond to it is [the marketer] put in there specifically volumes, which is a compliance issue, he can't refer that way to discussion points. That's the reason why I didn't respond to the e-mail, because it would then acknowledge that we understood he's talking about price for volume. So, anytime someone does that and they e-mail you and say, "Hey I have 20 of this or 100 of that or 50 of that and you know, can I get 1200 per sample'" or whatever it is, just don't even respond to it on e-mail. Don't even acknowledge it, just pick up the phone and call them and say, you know, you cannot put any of those things in writing . . . .

91.    On or about August 5, 2021, during the conversation referenced above, RONALD KING told ROBERT O'SULLIVAN that KING would authorize a contract for the marketer for $700,000 per year based on 85 referrals per month at $700 each, or $59,500 per month, equivalent to $714,000 per year, "and then we'll just plus or minus him based on how he does on a month to month basis."

92.    On or about May 3, 2021, as reflected in minutes of an executive meeting involving RONALD KING, TINA WELLMAN, VICTOR ROITER, BRADLEY EDSON, and another, VICTOR ROITER reported that he was "putting together 2 or 3 new deals. One is 1200-1500/month, the other 1000/ month to start in May" and "Closed one today for 150 samples."

93.    On or about May 3, 2021, as reflected in minutes of an executive meeting involving RONALD KING, TINA WELLMAN, VICTOR ROITER, BRADLEY EDSON, and another, RONALD KING reported that he "closed another group 200 and another of

26

2,000. They are going to scale a bit. Month 1, 700/month, month 2, 1400 and month 3 will be 3000."

94.     On or about July 16, 2021, RONALD KING e-mailed Individual E attaching, inter alia, an "independent marketing agreement" from Laboratory A and reports from Laboratory A and Laboratory 2 for "the sales groups you asked for yesterday on 2020 and 2021. These are accepted samples only . . . ."

95.     On or about August 6, 2021, VICTOR ROITER e-mailed employees of Billing Company and Claro, informing them that, "yesterday was payday for our reps," that there were "multiple complaints that the numbers are not correct and that the conversations were had that the amount of samples received by the lab, number of approved and number of corrected samples," and asking the e-mail recipients to "provide me with the amount of samples received for the following groups in July and I need to know the number or samples accepted after the corrections were sent it."

96.     On or about August 30, 2021, as documented in meeting minutes, RONALD KING instructed participants in an "executive meeting," including BRADLEY EDSON, TINA WELLMAN, and another that the laboratory needed to get samples tested sooner after arriving in the laboratory to help with margin because "[w]e are pushing too much forward to the following months while marketer payments are high due to the volume they bring in."

97.     On or about September 20, 2021, as reflected in minutes of an executive meeting involving RONALD KING, TINA WELLMAN, VICTOR ROITER, BRADLEY EDSON, and another, the co-conspirators discussed that "[Marketing Company G] is a

new lab group. These are primary care providers and they did a few hundred samples in a few weeks. They are on track to perform well. Based on projections they will be given another contract with 303 and spread the wealth with other locations."

98.     On or about May 9, 2022, ROBERT O'SULLIVAN texted with VICTOR ROITER about a kickback payment to a marketer. O'SULLIVAN asked if ROITER had "[a]ny idea what the payment to [marketer] will be tomorrow?" ROITER responded, "Who said it will be tomorrow? I did not see the scrubbing report / Was the scrubbing report sent over?" and continued that, "I will be able to tell you what the payment should be after I see the report." ROITER communicated that based on "14 samples for March and April. All PGX 500x14 = 7,000." When O'SULLIVAN asked if he should relay that information to the marketer, ROITER responded, "You can, just call him don't put anything in writing."

99.     On or about June 1, 2022, JOHN GAUTEREAUX authorized the addition of his name as an owner for 303 Diagnostics LLC to the Medicare enrollment information.

100.    On or about the dates listed below, each constituting a separate overt act, RONALD KING caused kickback and bribe payments to be made from bank accounts associated with the Tesis Laboratories, as identified below, to marketers' bank accounts, in exchange for the referral of beneficiaries for genetic testing:

|    | On or About Date of Payment | Payment Amount | Account Paid From | Account Paid To |
|----|---------|---------|---------|---------|
| a. | June 10, 2020 | $60,000 | BOKF Account #6172 (Tesis) | Wells Fargo Account #1281 (Marketing Company B-2) |

| | | | | |
|---|---|---|---|---|
| b. | July 24, 2020 | $100,000 | BOKF Account #6733 (Claro Point LLC) | JPMorgan Chase Account #8929 (Individual C) |
| c. | October 19, 2020 | $103,200 | BOKF Account #6733 (Claro Point LLC) | Truist Bank (formerly SunTrust Bank) Account #1176 (Marketing Company B-1) |
| d. | October 30, 2020 | $144,000 | BOKF Account #6733 (Claro Point LLC) | FirstBank Account #9227 (Marketing Company D) |
| e. | June 11, 2021 | $150,000 | BOKF Account #6733 (Claro Point LLC) | Bank of America Account #8671 (Marketing Company H) |
| f. | October 5, 2021 | $433,000 | BOKF #6226 (Alliance) | Wells Fargo Bank Account #1669 (Marketing Company A) |
| g. | December 1, 2021 | $235,500 | BOKF Account #6733 (Claro Point LLC) | Bank of America Account #4628 (Marketing Company I) |
| h. | December 1, 2021 | $165,600 | BOKF Account #6226 (Alliance) | JPMorgan Chase Account #2859 (Marketing Company F) |
| i. | February 16, 2022 | $150,000 | BOKF #6226 (Alliance) | Truist Bank (formerly SunTrust Bank) Account #2194 (Marketing Company G) |
| j. | June 16, 2022 | $40,000 | BOKF #8034 (303 Diagnostics) | Truist Bank Account #8046 (Marketing Company J) |
| k. | September 30, 2022 | $250,000 | BOKF #6226 (Alliance) | Bank of America Account #1025 (Marketing Company K) |

The foregoing is in violation of Title 18, United States Code, Section 371.

**COUNT 3**
**18 U.S.C. § 1956(h)**

101.    Beginning in or around August 2020 and continuing through in or around

December 2021, in the state and District of Colorado and elsewhere, the defendants,

RONALD KING, VICTOR ROITER, and TINA WELLMAN, did knowingly combine,

conspire, confederate, and agree with each other and others known to the grand jury to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to commit wire fraud and health care fraud in violation of Title 18, United States Code, Section 1349 and conspiracy to offer and pay kickbacks and bribes in connection with a Federal health care program, in violation of Title 18, United States Code, Section 1320a-7b(b)(2)(A), knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

102.    Acting interdependently, the co-conspirators used the following manner and means to accomplish the objectives of the conspiracy:

103.    The co-conspirators agreed to take "overrides" on the payments received from Medicare for referrals the laboratories purchased from marketing companies the co-conspirators recruited.

104.    VICTOR ROITER caused his associates to establish shell companies in their names to receive payments from Tesis, the laboratories, and other entities for the overrides. VICTOR ROITER caused these associates to open bank accounts for the

shell entities, and ROITER obtained access to these accounts to control and issue payments from the accounts.

105.    VICTOR ROITER and RONALD KING caused sham marketing contracts to be signed with these shell entities, calling for payment of hundreds of thousands of dollars per month to the entities they controlled for bogus "marketing services." Such shell entities included Tikor Group LLC (established in the name of ROITER'S the girlfriend), Rook LLC (established in the name of Individual E), and PF Consultants LLC (established in the name of ROITER's personal friend).

106.    The-conspirators caused Claro, Alliance, and Billing Company employees to track genetic tests for the beneficiaries referred to the Tesis Laboratories that were subject to the "override" agreement under these shell company entities for payment purposes, so the co-conspirators could account for overrides to be paid to themselves.

107.    VICTOR ROITER and RONALD KING caused payments for the "overrides" to be issued from Tesis entity bank accounts to accounts in the name of the shell entities that ROITER controlled. ROITER then distributed the funds from the entity accounts for the benefit of himself, RONALD KING (through his entity, Kingship Consulting LLC), TINA WELLMAN, and others. In total, the co-conspirators knowingly caused monetary transfers in or affecting interstate commerce of millions of dollars to the shell entities for their benefit.

108.    VICTOR ROITER, RONALD KING, and TINA WELLMAN, as identified below, conducted the following financial transactions, which involved the proceeds of health care fraud, wire fraud, and violations of the Anti-Kickback Statute:

|   | Transacting Individual | On or About Date of Transaction | Amount / Transaction | Initiating Account | Recipient Account |
|---|---|---|---|---|---|
| a. | KING | November 5, 2020 | $375,000 (wire) | BOKF Account #6733 (Claro Point LLC) | JPMorgan Chase Account #3582 (Tikor Group) |
| b. | WELLMAN | November 19, 2020 | $10,000 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | NBT Bank Account #4630 (Tina Wellman) |
| c. | KING | November 25, 2020 | $10,000 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | Northway Bank Account #8965 (Kingship Consulting) |
| d. | KING | December 7, 2020 | $375,000 (wire) | BOKF Account #6733 (Claro Point LLC) | JPMorgan Chase Account #5202 (Rook) |
| e. | WELLMAN | December 15, 2020 | $23,300 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | NBT Bank Account #4630 (Tina Wellman) |
| f. | KING | December 17, 2020 | $23,300 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | Northway Bank Account #8965 (Kingship Consulting) |
| g. | KING | January 6, 2021 | $375,000 (wire) | BOKF Account #6733 (Claro Point LLC) | JPMorgan Chase Account #5202 (Rook) |
| h. | WELLMAN | January 13, 2021 | $35,000 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | NBT Bank Account #4630 (Tina Wellman) |

| i. | KING | January 19, 2021 | $35,00 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | Northway Bank Account #8965 (Kingship Consulting) |
|---|---|---|---|---|---|
| j. | KING | February 5, 2021 | $375,000 (wire) | BOKF Account #6733 (Claro Point LLC) | JPMorgan Chase Account #5202 (Rook) |
| k. | WELLMAN | February 17, 2021 | $43,300 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | NBT Bank Account #4630 (Tina Wellman) |
| l. | KING | February 22, 2021 | $43,300 (check deposit) | JPMorgan Chase Account #8996 (Victor Roiter) | Northway Bank Account #8965 (Kingship Consulting) |
| m. | KING | March 16, 2021 | $145,000 (wire) | TD Bank Account #7913 (Alliance) | JPMorgan Chase Account #5207 (PF Consultants) |
| n. | ROITER | March 17, 2021 | $98,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | Northway Bank Account #8965 (Kingship Consulting) |
| o. | ROITER | March 17, 2021 | $98,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | NBT Bank Account #4630 (Tina Wellman) |
| p. | KING | April 5, 2021 | $375,000 (wire) | BOKF Account #6733 (Claro Point LLC) | JPMorgan Chase Account #5207 (PF Consultants) |

| | | | | | |
|---|---|---|---|---|---|
| q. | KING | April 9, 2021 | $50,000 (wire) | TD Bank Account #7913 (Alliance) | JPMorgan Chase Account #5207 (PF Consultants) |
| r. | ROITER | April 9, 2021 | $60,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | NBT Bank Account #4630 (Tina Wellman) |
| s. | ROITER | April 9, 2021 | $60,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | Northway Bank Account #8965 (Kingship Consulting) |
| t. | KING | May 5, 2021 | $67,500 (wire) | BOKF Account #6226 (Alliance) | JPMorgan Chase Account #5207 (PF Consultants) |
| u. | ROITER | May 6, 2021 | $20,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | NBT Bank Account #4630 (Tina Wellman) |
| v. | ROITER | May 6, 2021 | $20,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | Northway Bank Account #8965 (Kingship Consulting) |
| w. | KING | July 8, 2021 | $110,800 (wire) | BOKF Account #6226 (Alliance) | JPMorgan Chase Account #5207 (PF Consultants) |
| x. | KING | July 8, 2021 | $145,200 (wire) | BOKF Account #6733 (Claro Point LLC) | JPMorgan Chase Account #5207 (PF Consultants) |

| | | | | | |
|---|---|---|---|---|---|
| y. | ROITER | July 8, 2021 | $45,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | NBT Bank Account #4630 (Tina Wellman) |
| z. | KING | August 12, 2021 | $163,685 (wire) | BOKF Account #6226 (Alliance) | JPMorgan Chase Account #5207 (PF Consultants) |
| aa. | ROITER | August 13, 2021 | $30,000 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | NBT Bank Account #4630 (Tina Wellman) |
| bb. | KING | September 7, 2021 | $222,250 (wire) | BOKF Account #6226 (Alliance) | JPMorgan Chase Account #5207 (PF Consultants) |
| cc. | ROITER | September 8, 2021 | $45,933 (wire) | JPMorgan Chase Account #5207 (PF Consultants) | NBT Bank Account #4630 (Tina Wellman) |

The foregoing is in violation of Title 18, United States Code, Section 1956(h).

## **FORFEITURE ALLEGATION**

109.    The allegations above are realleged and incorporated by reference for purposes of alleging forfeiture pursuant to Title 18, United States Code, Sections 982(a)(1), 982(a)(7), 982(a)(8), 981(a)(1)(A), and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

110.    Upon conviction of the violations alleged in Count 1 involving the commission of violations of Title 18, United States Code, Sections 1349, 1343, and 1347, defendants identified in Count 1 shall forfeit to the United States, pursuant to Title

18, United States Code, Sections 982(a)(7), 982(a)(8), and 981(a)(1)(C), and Title 28,

United States Code, Section 2461(c), any and all of each defendant's right, title, and

interest in all property constituting and derived from any proceeds the defendant

obtained directly and indirectly as a result of such offense, including but not limited to

the assets listed in paragraph 113.

111.    Upon conviction of the violations alleged in Count 2 involving the

commission of violations of Title 18, United States Code, Section 371 and Title 42,

United States Code, Section 1320a-7b(b), defendants identified in Count 2 shall forfeit

to the United States, pursuant to Title 18, United States Code, Sections 982(a)(7), and

981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of each

defendant's right, title, and interest in all property constituting and derived from any

proceeds the defendant obtained directly and indirectly as a result of such offense,

including but not limited to the assets listed in paragraph 113.

112.    Upon conviction of the violations alleged in Count 3 involving the violation

of Title 18, United States Code, Section 1956(h), defendants identified in Count 3 shall

forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(1),

982(a)(7), and 981(a)(1)(A), and Title 28, United States Code, Section 2461(c), any and

all of each defendant's right, title, and interest in all property, real or personal, involved

in such an offense, or any property traceable to such property, including but not limited

to the assets listed in paragraph 113.

113.    The specific assets to be forfeited include but are not limited to:

    a.   Approximately $82,357.18 in funds from Bank of Oklahoma account
         #6161 in the name of Tesis Labs, LLC;

b. Approximately $1,017.77 in funds seized from Bank of Oklahoma account #6172 in the name of Tesis Labs LLC;

c. Approximately $6,856.17 in funds from JP Morgan Chase account #4752 in the name of Claro Scientific Labs;

d. Approximately $8,278.35 in funds from Bank of Oklahoma account #6722 in the name of Claro Labs, LLC;

e. Approximately $960.70 in funds from Bank of Oklahoma account #6733 in the name of Claro Point LLC;

f. Approximately $158,037.32 in funds from TD Bank account #7913 in the name of Alliance DX LLC;

g. Approximately $309.86 in funds from Bank of Oklahoma account #6226 in the name of Alliance DX;

h. 2022 Jeep Wrangler VIN: 1C4HJXEGXNW256066, seized from Ronald King;

i. A cartier diamond ring, seized from Ronald King;

j. Approximately $342,945.03 in funds from Wells Fargo bank Account #9150 in the name of Tikor Marketing, LLC;

k. Approximately $25,287.26 in funds from Citibank Account #1481 in the name of Tikor Group LLC;

l. Approximately $265,936.76 in funds from Citibank Account #6971 in the name of Redstone Consulting LLC;

m. Approximately $51,595.50 in funds from Citibank Account #8483 in the name of Victor Roiter;

n. Approximately $5,782.98 in funds from Citibank Account #8496 in the name of Victor Roiter;

o. Approximately $20,359.25 in funds from Citibank Account #0558 in the name of O.T.;

p. Approximately $7,700.00 U.S. Currency seized by the FBI on July 12, 2022, in Sunny Isles Beach, Florida;

q. Approximately $6,400.00 U.S. Currency seized by the FBI on July 12, 2022, in Sunny Isles Beach, Florida;

r.  Miscellaneous jewelry seized by the FBI on July 12, 2022, in Sunny Isles Beach, Florida;

s.  Approximately $35,707.82 Bank of Richmondville account #6747, in the name of Valley Vantage Consulting, LLC;

t.  Approximately $2,197,744.83 in Fidelity account #3207, in the name of Tina Wellman;

u.  Approximately $190,435.69 in Fidelity #3490, in the name of Tina Wellman;

v.  Approximately $264,371.38 in Fidelity account #7329, in the name of Tina Wellman;

w.  Approximately $118,569.48 in Fidelity account #3509, in the name of Tina Wellman;

x.  Real Property Located at 149-151 Elm St. Cobleskill, New York;

y.  Real Property Located at 8125 N 86th PL, Scottsdale, Arizona 85258-4310;

z.  Any assets seized from the following entities: Redstone Consulting LLC; Tikor Group LLC; Tikor Marketing LLC; Tesis Labs, LLC; Tesis Biosciences, LLC; Tesis Property Holdings, LLC; Claro Scientific Laboratories LLC; Claro Labs LLC; Claro Point LLC;  Alliance DX LLC; 303 Diagnostics, LLC; 303 Point LLC; Tesis Labs of Arizona, LLC; Genome Explorations, Inc.; and all nominees, parent companies, subsidiaries, affiliates, or otherwise related entities of the foregoing;

aa. A money judgment in the amount of proceeds obtained by the conspiracy and scheme, and by the defendants.

114.  If any of the property described above, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been comingled with other property which cannot be subdivided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section

853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek

forfeiture of any other property of said defendant up to the value of the forfeitable

property.

A TRUE BILL:

Ink signature on file in Clerk's Office
FOREPERSON

MATTHEW T. KIRSCH
Acting United States Attorney

By:___*/s/ Anna K. Edgar*___
Anna K. Edgar
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0405
E-mail: Anna.Edgar@usdoj.gov
Attorney for the United States