IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 24-CR-0251-RMR-03

UNITED STATES OF AMERICA,

     Plaintiff,

v.

3.     TINA WELLMAN,

     Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Anna Edgar, Assistant United States Attorney for the District of Colorado, and the defendant, Tina Wellman, personally and by counsel, Emmett Matthew Leeper, III, submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1. This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

## I.    AGREEMENT

### A.  Defendant's Plea of Guilty

The defendant agrees:

(1)    to plead guilty to the violation of 18 U.S.C. § 1349, conspiracy to commit health care fraud in violation of 18 U.S.C. 1347, as charged in Count 1 of the Indictment,[1] and to plead guilty to Count 2 of the Indictment, charging

---

[1] The defendant will not plead guilty to the separate wire fraud (18 U.S.C. § 1343) object of the conspiracy charged in Count 1, and the parties agree that the plea is to the health care fraud object only.

COURT EXHIBIT
1

a violation of 18 U.S.C. § 371, conspiracy to violate 42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C. § 220(a)(2)(A);

(2)  to waive certain appellate and collateral attack rights, as explained in detail below;

(3)  to be liable for restitution, as detailed below; and

(4)  to admit forfeiture and to cooperate in all forfeiture matters, as more fully described below.

**B. Government's Obligations**

This agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A) and (B).

The government agrees to dismiss Count 3 of the Indictment as to the defendant and not to pursue the wire fraud object of Count 1 of the Indictment. The United States Attorney's Office for the District of Colorado agrees not to bring other charges against the defendant based on information currently known to it.

The government agrees to recommend a sentence not greater than the bottom of the guideline range as finally calculated by the Court, less any downward departures under the U.S. Sentencing Guidelines that the government agrees apply.

The government agrees to consider whether to affirmatively support or not object to a departure under U.S.S.G. § 5H1.4 based on the defendant's medical condition. The determination will be made at the government's discretion based on evidence of the defendant's medical condition presented at the time of sentencing.

The parties agree that the defendant may request, pursuant to 18 U.S.C § 3553(a), a sentence below the U.S. Sentencing Guidelines range ultimately determined by the Court or recommended by the government. The government

reserves the right to oppose such a request and to present argument and evidence against a variance and in favor of its sentencing recommendation.

Provided the defendant does not engage in prohibited conduct or otherwise implicate U.S.S.G. §§ 3C1.1 and 3E1.1, cmt. n.4, between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b).

**C. Defendant's Waiver of Appeal**

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)   the sentence exceeds the maximum allowable statutory sentence;

(2)   the sentence exceeds the top end of the advisory guideline range from the U.S. Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court);

(3)   the government appeals the sentence imposed.

If the first criterion applies, the defendant may appeal only the issue of how the sentence exceeds the statutory maximum sentence. But if one of the latter two criteria

apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the U.S. Sentencing Guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied during the district court revocation proceedings. In that event, this waiver does not apply, and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the Court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A), where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a)

grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

### D. Restitution and Forfeiture

The defendant agrees that 18 U.S.C. § 3663A applies and acknowledges that a restitution order is mandatory. The government collects restitution in accordance with the provisions of 18 U.S.C. § 3613. The total restitution amount associated with the conspiracies charged is $50,044,359.02, consisting of $1,378,039.22 paid to Tesis laboratories by Colorado Medicaid, $48,083,522.90 paid to Tesis laboratories by Medicare, and $582,796.90 paid to Home Genetics Ltd. by Medicare. The defendant stipulates that the tests for which the Tesis laboratories and Home Genetics submitted claims to health care programs were obtained by fraud, were not medically necessary, and the full amount identified by the government is recoverable as restitution. The defendant's position is that the Court should apportion restitution pursuant to 18 U.S.C. § 3664(h), and she reserves the right to argue at sentencing that she should be responsible only for a portion of the restitution owed. The government's position is that the defendant should be ordered to pay the full amount of restitution, jointly and severally with any convicted co-conspirators.

The defendant admits the forfeiture allegations in the Indictment. The defendant further agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. §§ 982(a)(7) and 981(a)(1)(C), and 28 U.S.C. § 2461(c), any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds the

defendant obtained directly and indirectly as a result of such offense, whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere. The assets to be forfeited specifically include but are not limited to entry of a forfeiture money judgment in the amount of $3,068,200.29. The defendant agrees that $3,068,200.29 is the total value of the gross proceeds she received that are traceable to her offenses of conviction. The government stipulates that the estimated value of the assets seized as identified in the civil forfeiture action, case number 23-cv-03298-NRN, based on fraud and money laundering allegations as to the defendant personally is approximately $3,145,829.20. (This assumes the value of the Cobbleskill properties identified in the forfeiture complaint is $339,000, the purchase price). The government stipulates and agrees that the difference between the forfeiture money judgment amount and the amount subject to forfeiture as identified in the civil forfeiture complaint is $77,628.91. The government stipulates and agrees that it will not seek forfeiture of this amount ($77,628.91), and it will be returned to the defendant or credited against the value of an asset or assets identified in the civil forfeiture complaint that the defendant requests to retain. Should the defendant present sufficient evidence that any portion of the funds or assets identified in the civil forfeiture complaint are not forfeitable pursuant 18 U.S.C. § 982(a)(7) and/or 18 U.S.C. § 981(a)(1)(c) and (a)(2)(A), the government agrees to not pursue their forfeiture as directly traceable assets and will work with the defendant on identifying substitute assets to satisfy the money judgment of $3,068,200.29, which may or may not include the assets identified in the civil forfeiture complaint. The defendant understands, however, that the government may seek

forfeiture of any non-forfeited assets belonging to the defendant to satisfy the forfeiture money judgment in the amount of $3,068,200.29. The government agrees to consult with the defendant prior to any such enforcement action on substitute assets. Any funds derived from forfeited assets, directly or as substitute assets, shall be applied to the forfeiture money judgment.

The defendant further agrees to cooperate and assist the government in satisfaction of the forfeiture money judgment, including providing information on any third-party claims related to a forfeitable asset and providing testimony in any related third-party ancillary proceeding. The defendant's assistance shall include identification of property available to satisfy the forfeiture money judgment, and the transfer of such property to the United States upon request of the government by delivery of any necessary and appropriate documentation, including consents to forfeiture and quit claim deeds.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture. Notwithstanding the foregoing, the United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from forfeiture be remitted or restored to eligible victims of the offenses, for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether

to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

The defendant shall provide the government and the Probation Office with a full, complete, and accurate personal financial statement. The defendant agrees to provide, in a timely manner, all financial information requested by the government and, upon request, to meet remotely or in person to identify assets/monies which can be used to satisfy a forfeiture or restitution judgment. If the defendant deliberately provides incomplete or untruthful statements in her personal financial statement, this action shall be deemed a material breach of this Agreement and the government shall be free to pursue all appropriate charges against her notwithstanding any agreements to forbear from bringing additional charges otherwise set forth in this Agreement.

### E. Effect of Vacatur

Should the defendant's plea of guilty be vacated for any reason on motion of the defendant, the government may, in its sole discretion, file any charges against the defendant that were within the statute of limitations on the date of the defendant's plea of guilty. The defendant expressly agrees that the statute of limitations for any such counts is tolled from the date of her guilty plea until the date the plea is vacated.

## II.    ELEMENTS OF THE OFFENSES

The parties agree that the elements of the charged offenses are as follows:

### Count 1

Conspiracy, 18 U.S.C. § 1349

1. Two or more people reached an agreement to commit the crime of health care fraud, in violation of 18 U.S.C. § 1347.

2. The defendant knew the essential objectives of the conspiracy.

3. The defendant knowingly and voluntarily participated in the conspiracy.

4. The alleged coconspirators were interdependent.

*United States v. Wright*, 848 F.3d 1274, 1279 (10th Cir. 2017).

Health Care Fraud, 18 U.S.C. § 1347

1. The defendant knowingly executed, or attempted to execute, a scheme or artifice
   to defraud a health-care benefit program—here, Medicare and Colorado
   Medicaid—or to obtain money or property owned by, or under the custody or
   control of, a health-care benefit program, by using false or fraudulent pretenses,
   representations, or promises.

2. The health care benefit program affected interstate commerce.

3. The false or fraudulent pretenses, representations, or promises related to a
   material fact.

4. The defendant acted willfully and intended to defraud.

5. The defendant did so in connection with the delivery of or payment for health-
   care benefits, items, or services.

18 U.S.C. § 1347; Pattern Crim. Jury Instr. 11th Cir. OI O53.1 (2024).

## **Count 2**

Conspiracy, 18 U.S.C. § 371

1. The defendant agreed with at least one other person to violate the law.

2. One of the conspirators engaged in at least one overt act furthering the
   conspiracy's objective.

3. The defendant knew the essential objective of the conspiracy.

4. The defendant knowingly and voluntarily participated.

5. There was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

Tenth Cir. Pattern J.I. § 2.19.

Offering and Paying Kickbacks and Bribes, 42 U.S.C. § 1320a-7b(b)(2)(A)

1. The defendant or a co-conspirator offered or paid any remuneration (including kickbacks and bribes), directly or indirectly, overtly or covertly, to a person.

2. The remuneration or offer of remuneration was made to induce the person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service paid for, in whole or in part, by a Federal health care program, which, in this case, is Medicare and Colorado Medicaid.

3. The defendant acted knowingly and willfully.

42 U.S.C. § 1320a-7b(b)(2)(A); see also United States v. Patel, 9:19-cr-80181 (S.D. Fla.); Eric Wm. Ruschky, Pattern Jury Instructions for Federal Criminal Cases, District of South Carolina (2024 Online Edition).

Eliminating Kickbacks in Recovery Act (EKRA), 18 U.S.C. § 220

1. The defendant offered or paid any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind.

2. The defendant offered or paid the remuneration to induce a referral of an individual to a laboratory for services performed by the laboratory.

3. The defendant acted knowingly and willfully.

4. The services for which the referrals were made were covered by a health care benefit program, in or affecting interstate commerce.

18 U.S.C. § 220(a)(2)(A).

## III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Conspiracy to Commit Health Care Fraud, as charged in Count 1 of Indictment, is: not more than ten years of imprisonment; not more than three years of supervised release; a fine of not more than

the greater of $250,000 or twice the gross gain or loss pursuant to 18 U.S.C. § 3571(d); a $100 mandatory victim's fund assessment fee; restitution; and forfeiture.

The maximum sentence for the violation charged in Count 2 of the Indictment, Conspiracy to Offer and Pay Illegal Kickbacks in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C. § 220(a)(2)(A) is: not more than five years of imprisonment; not more than three years of supervised release; a fine of not more than the greater of $250,000 or twice the gross gain or loss pursuant to 18 U.S.C. § 3571(d); a $100 mandatory victim's fund assessment fee; restitution; and forfeiture.

## IV.   COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury. The defendant understands and acknowledges that, as a result of her conviction, she will be excluded as a provider from Medicare, Medicaid, and all Federal health care programs.

## V.   STIPULATION OF FACTS

The following statement is a summary made for the purposes of providing the Court with a factual basis for the guilty plea and does not include all of the facts known to the parties concerning the criminal activity in which the defendant and others engaged.

Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below that are pertinent to those considerations and computations. To the extent the

parties disagree about the facts set forth below, the stipulation of facts identifies which

facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-

contradictory additional facts that are relevant to the Court's guideline computation, the

18 U.S.C. § 3553 factors, the parties' arguments in support of their sentencing

positions, or to the Court's overall sentencing decision.

The defendant stipulates and agrees to the allegations set forth in the Indictment

with respect to Counts 1 and 2, and the parties further stipulate that the following facts

are true and correct.

Beginning in or around January 2020 and continuing through at least December

2022, in the State and District of Colorado and elsewhere, the defendant knowingly and

voluntarily conspired and agreed with Defendants Ronald King, Victor Roiter, and Adam

Shorr to knowingly and willfully execute a scheme and artifice to defraud health care

benefit programs affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare

and Colorado Medicaid, and to obtain, by means of materially false and fraudulent

pretenses, representations, and promises, money and property owned by, and under

the custody and control of, said health care benefit programs, in connection with the

delivery of and payment for health care benefits, items, and services, in violation of 18

U.S.C. § 1347.

Beginning not later than January 2020 and continuing through at least December

2022, in the State and District of Colorado and elsewhere, the defendant knowingly and

willfully conspired and agreed with Ronald King, Victor Roiter, Robert O'Sullivan, John

Gautereaux, Adam Shorr, and Bradley Edson to offer and pay illegal health care
kickbacks and bribes, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C.
§ 220(a)(2)(A), to individuals and entities identified as "marketers" in exchange for the
referral of beneficiaries and genetic testing orders to laboratories the co-conspirators
owned and operated for the furnishing and arranging for the furnishing of genetic
testing, for which payment was made in whole or in part under Federal health care
programs, that is, Medicare and Colorado Medicaid, and health care benefit programs in
and affecting interstate commerce, including commercial health insurers.

The defendant, along with Ronald King, Victor Roiter, Adam Shorr, Robert
O'Sullivan, Bradley Edson, and John Gautereaux, established Tesis Labs LLC, later
known as Tesis Biosciences LLC (Tesis), in late 2019 with the purpose of acquiring and
operating genetic testing labs that could bill Federal and other health care programs for
said testing. The defendant was an owner of Tesis through her company, Valley
Vantage Consulting, LLC. Ownership of Tesis was held by Series A and Series B unit
holders. When Tesis was established, the defendant owned approximately 11% of the
company through her Series B units. In November 2019, the defendant signed an
agreement to provide administrative services to "manage the day-to-day operations" of
Tesis, including through the billing company she solely owned and that she operated
from New York (hereinafter, the "Billing Company"). The defendant also agreed to be
the Chief Operating Officer of Tesis, and she continued in this role until November
2020, when King and Edson agreed to hire a new COO for Tesis.

The defendant, King, Roiter, Shorr, O'Sullivan, Edson, and Gautereaux, through

Tesis, acquired and operated four genetic testing laboratories: Claro Scientific

Laboratories, Inc. (Claro), Alliance DX LLC (Alliance), 303 Diagnostics LLC, and Tesis

Labs of Arizona LLC (Tesis Arizona) (collectively, the Tesis laboratories). Claro,

Alliance, and 303 Diagnostics filed claims for reimbursement with and received payment

from Federal health care programs (including Medicare and Colorado Medicaid),

commercial health insurers, and others. Claro and 303 Diagnostics were both located in

Colorado. The co-conspirators used Tesis Arizona to run tests and receive payment

from third-party laboratories that would bill Federal health care programs for the tests,

including for third-party laboratory Home Genetics Ltd.

The defendant was the sole owner and the CEO of Billing Company, which she

founded in 2014. Billing Company submitted the Tesis laboratory claims to Federal

health care programs and commercial insurance programs and directed the claims

process to maximize payment to the Tesis laboratories. King served as Chief Operating

Officer for Billing Company beginning in 2019 and resigned his formal position in 2020

after becoming the CEO of Tesis. At all times relevant to the conspiracies, King

remained involved in running and directing the activities of Billing Company, although he

had no formal title at the company. Billing Company was based in New York and

employed individuals located in the United States and in India.

Tesis, through employees of Billing Company and under the defendant's

direction, created genetic testing "panels" that it held out as pertaining to certain types

of medical conditions, such as cardiac conditions or cancer. For example, Tesis had a

"comprehensive cardiac" panel and a "cancer" panel. Each panel purported to test for a

list of genes allegedly associated with diseases in the category for the panel. Tesis and

the Billing Company assigned multiple billing codes (CPT codes) to the claim for each

panel based on the genes included in the test. Health care programs, including

Medicare and Colorado Medicaid, could reimburse thousands of dollars per "panel"

based on the billing codes the laboratories submitted on their claims.

Tesis created requisition forms, or doctors' orders, for these testing panels.

Before Tesis could run a genetic testing panel and submit claims for the panels, a

provider enrolled with Medicare or Medicaid had to "order" the test by signing the

requisition form. The requisition form was to include information that Tesis then listed on

its claim to the payer, including the diagnosis codes for the beneficiaries' medical

conditions that purported to establish, in part, the medical necessity for the test.

To generate testing revenue, Tesis illegally bought referrals from individuals the

defendant and her co-conspirators identified as "marketers." That is, the Tesis

laboratories paid individuals kickbacks and bribes to solicit Federal health care program

beneficiaries (i.e., the elderly) directly to participate in genetic testing, to procure signed

doctors' orders from providers for genetic tests, and to refer beneficiaries with the

signed doctors' orders for genetic tests to the laboratories. The laboratories then filed

claims for and received payment for the tests.

### The Autumn Partnership "Proof of Concept"

Before establishing Tesis and purchasing the Tesis laboratories, the defendant,

King, Roiter, Shorr, O'Sullivan, Gautereaux, and Edson participated in a "proof of

concept" exercise through the entity Autumn Partnership LLC, beginning in or around

October 2019.

The defendant was a participant in Autumn Partnership. The Autumn Partnership

participants agreed to purchase genetic testing "leads" from a marketing group that

operated a call center and to sell those leads to a genetic testing laboratory in exchange

for kickbacks. "Leads" were genetic testing requisition forms signed by physicians for a

beneficiary who had been recruited to participate in genetic testing through the call

center. After purchasing these "leads" from Autumn Partnership, the laboratory would

run the test, file claims for the tests with Medicare, and receive payment. The laboratory

that purchased the Autumn Partnership referrals was one of the defendant's Billing

Company clients (Lab B), so the defendant and King had visibility into the billing and

could see how much Medicare paid the laboratory for the referrals Autumn Partnership

sold it. Gautereaux had connections with the owner of Lab B and negotiated the

relationship between Autumn Partnership and Lab B. The goal of operating Autumn

Partnership was to demonstrate that operating a genetic testing laboratory based on

this model would be profitable, so Tesis could obtain funding to buy its own laboratory

and start billing for genetic testing.

Autumn Partnership sold referrals to Lab B in exchange for per-test payments,

but Autumn Partnership participants and Lab B disguised the kickback payments with a

"flat fee" agreement intended to conceal the fact that payment to Autumn Partnership

was based illegally on the volume and value of the referrals it sold to the laboratory.

The defendant worked with Roiter and others to recruit "marketers" who could

sell referrals to Autumn Partnership, which could in turn sell them to the laboratory. The defendant was aware of the negotiation of unlawful per-referral payments with these marketers. For example, in January 2020, the defendant consulted with King regarding a question from Roiter regarding how much to offer a marketer. King advised to offer a marketer $1,800 per referral so Autumn Partnership could collect $400 per referral based on a sales price the laboratory paid Autumn Partnership of $2200 per sample. Wellman provided this answer to Roiter.

The defendant knew this payment model—based on the volume and value of the referrals made to a laboratory—was unlawful. For example, the defendant received an e-mail on December 22, 2019, from co-defendant Gautereaux that forwarded the defendant and others an "exemplar doc" of a Certified Public Accountant (CPA) letter. The defendant did not respond to this e-mail. The laboratory owner who was paying Autumn Partnership for the referrals asked Autumn Partnership to have a CPA issue and sign this letter for purposes of Autumn Partnership's dealings with the laboratory to conceal the parties' illegal kickback agreement. The attached exemplar letter explained that "under state and federal healthcare laws any flat fee charged must result from the parties' arms-length negotiations, that do *not* take into account any volume or value of referrals or business otherwise generated between the parties . . . ." (Emphasis in letter). The exemplar called for a CPA to calculate a "weekly fair value compensation range" and to state that the CPA had reached this calculation based on consideration of factors regarding the value and cost of the "marketing" company's business, including: a "detailed evaluation" of the management team; the objectives and relevant time frame

for the services to be performed; the "specific skills and unique qualifications" the company would provide, including business expertise, leadership experience, knowledge of the healthcare industry, and reputation; the time requirements associated with the provision of services; the reasonable profit margin the company should expect to realize; and expenses incurred. These factors were purported to be the basis for the "flat fee" payment, but Autumn Partnership never engaged in this exercise to calculate a "fair value compensation" for its agreement with Lab B. Nor did Tesis engage in any "fair value" process when it later began to operate its own genetic testing laboratories and pay marketers for referrals. When the defendant and her co-conspirators ran and owned Tesis, they paid marketers based on the volume and value of the referrals the marketing companies provided to the Tesis laboratories each month. The defendant knew this was unlawful.

Once the Autumn Partnership participants demonstrated that they could purchase "leads" from marketers on a per-beneficiary (or per-test) basis, and the laboratory could make a substantial profit based on what it would receive in payment from Medicare, the co-conspirators were able to obtain funding to purchase a laboratory in Colorado—Claro—and begin Tesis's operations. Thus, through the Autumn Partnership "proof of concept," the co-conspirators established the business model for Tesis: the purchase of genetic testing referrals through kickbacks and bribes paid to "marketing" groups to enable billing to and payment from Medicare and other health care programs.

### *The Tesis Kickback Business Model*

At Tesis, the defendant and her co-conspirators agreed with marketers to pay them based on the number and type of testing referrals (e.g., cancer genetic testing ("CGx"), cardiac genetic testing, pharmacogenomic testing ("PGx"), immunodeficiency genetic testing, etcetera) the marketers would sell to the laboratories each month. The Tesis laboratories submitted claims to Medicare, Colorado Medicaid, and commercial insurers based on these referrals. Tesis offered the marketers payment per "accepted" referral; for example, the Tesis laboratories typically paid between $1200 and $1500 for an accepted, signed, doctor's order for cancer genetic testing (CGx) for a verified Medicare beneficiary. Marketers typically had a quota for the number of accepted referrals the marketers were expected to provide to Tesis each month.

The defendant learned that the Tesis business model was built on sham contracts between the Tesis laboratories and marketers to conceal the nature and source of these kickbacks and bribes and continued to participate in Tesis. Tesis created and had "marketing companies" sign contracts that falsely described the payment structure as a "flat fee" for purportedly legitimate "marketing and business services" that the co-conspirators did not intend for the marketers to perform and that the marketers did not perform. The parties calculated the "flat fee" based on the number and type of referrals the marketer committed to provide each month. For example, if Tesis agreed to pay $1200 per CGx test, and a marketer committed to provide 100 CGx tests per month, the contract would identify a "flat fee" payment of $120,000 per month. Tesis eventually transitioned to executing sham contracts that agreed to pay marketers

an annual flat fee, but the flat fee was calculated in the same way—that is, if Tesis

agreed to pay $1200 per CGx test and a marketer committed to provide 100 CGx tests

per month, the contract would identify a "flat fee" payment of $1,440,000 per year. The

contracts stated that payment was based on "fair market value," but the reality was, and

the defendant knew, that the payment was based illegally on volume and value.

The defendant discussed with marketers the per-test payment model and knew

that sham contracts would be executed to conceal these kickbacks and bribes. The

defendant was aware that her co-conspirators engaged in the same process to

negotiate payments with marketers on a per-referral basis and to conceal the volume

and value of the payments in sham contracts.

Tesis and Billing Company employees, including Tesis employees located in

Colorado, tracked the number and type of referrals each marketing company sold to the

Tesis laboratories and whether the referrals were "accepted" or "rejected" and should be

"corrected." Only "accepted" referrals—those Tesis expected to be paid for—counted

toward the marketer's quota. The defendant directed that doctors' orders for genetic

tests were "accepted" only if the orders identified a minimum number and type of

diagnosis codes (ICD-10 codes), such that the Billing Company believed the Tesis

laboratories would be paid a sufficient amount for the testing based on their

understanding of Medicare requirements. Wellman understood that Medicare and

Colorado Medicaid paid claims for genetic testing only if the claims identified diagnosis

codes (ICD-10 codes) that were facially related to the specific medical procedures or

tests identified on the claims. To manufacture facial justification for the claims, the

defendant and her co-conspirators caused marketers that worked with Tesis to participate in "medical necessity" training, during which marketers were instructed which diagnosis codes were required to appear on doctors' orders for the laboratories to "accept" the sample, based on Billing Company's understanding and interpretation of Medicare medical necessity requirements. The defendant personally provided "medical necessity" training to marketers and directed Billing Company employees to provide training to marketers. The defendant approved the PowerPoint presentations used for the training, which included the lists of diagnosis codes for each Tesis laboratory testing panel. The defendant states that the information included in the training was pulled from Medicare websites.

Requisitions that did not identify enough "valid" ICD-10 codes were rejected, and marketers were notified that these doctors' orders should be "corrected." The Billing Company, under the defendant's direction, reviewed each referral sold to the Tesis laboratories for "medical necessity"—that is, the number and type of diagnosis codes listed on the requisition forms. The Tesis defendants and Billing Company referred to this process as "scrubbing." The defendant directed her Billing Company employees in India to create scrubbing reports that identified the total number of referrals each marketing company submitted, the accepted or rejected status for each requisition, and whether "medical necessity" was met based on the Billing Company's review of the number and type of ICD-10 codes included on each order. The defendant caused Billing Company to create these reports so she and her co-conspirators could track the numbers and type of referrals each marketer sent in, and the accepted or rejected

status of each, and so marketers could be paid based on volume. For example, Billing

Company team meeting notes (drafted by a Billing Company employee) from a March

2021 meeting attended by King, Wellman, and two Billing Company employees note

that Billing Company employees had updated the scrubbing report format to include

identification of "rescrubbing" to track samples that had been rejected and then

accepted (i.e., "corrections") noting, "reason: marketers paid on accepted samples." The

scrubbing reports were shared with marketers to allow marketers to track progress

toward their monthly quotas, to submit "corrections," and to ensure they met their

monthly referral numbers for "accepted" referrals.

If a marketer failed to hit their monthly quota, the marketer's payment from the

Tesis laboratory would be skipped or delayed, or the marketer's contract would be

terminated. If a marketer exceeded their quota, the defendant was aware they could be

given a second contract with a different Tesis laboratory to justify increased payments

to the marketer for the higher volume. Roiter and King participated in drafting these

additional contracts.

The defendant's actions and participation in the conspiracy caused the payment

of illegal kickbacks and bribes to marketing companies by the Tesis laboratories. This

included payment for referrals sent to the Colorado laboratories—Claro and 303

Diagnostics.

The defendant and her co-conspirators operated this kickback business model

with the common goal of maximizing revenue to benefit themselves as owners of Tesis.

The defendant admits that she committed, or that others committed and she was

witness to or a participant in, the overt acts identified in paragraphs 66, 67, 68, 70, 71,
72, 73, 76, 92, 93, 96, and 97 in the Indictment, and that these overt acts were intended
to and did further the conspiracy charged in Count 2 and the health care fraud
conspiracy identified in Count 1, discussed below.

### Health Care Fraud

The defendant caused Medicare and Colorado Medicaid to issue payments to
the Tesis laboratories for fraudulent genetic testing claims. The defendant intentionally
submitted and caused the submission of claims she knew to be fraudulent because the
claims (1) were obtained through false statements and misrepresentations made to
beneficiaries to induce their participation in genetic testing, (2) were for medically
unnecessary tests that (a) contained false information designed to induce the payments,
including false diagnosis codes, and that (b) violated Medicare and Medicaid rules
because, inter alia, the tests were not for the purpose of diagnosing or treating a
medical condition; and (3) were procured through the payment of illegal kickbacks and
bribes, as described above.

*(1) The claims were based on false statements and misrepresentations to
beneficiaries.*

The defendant and her fraud co-conspirators (King, Roiter, and Shorr) agreed to
pay marketers they knew would target Federal health care program beneficiaries—
mainly the elderly who were likely to have Medicare coverage—by using telemarketers
at call centers to solicit and induce the beneficiaries to accept genetic tests regardless
of medical necessity and through false pretenses and representations. For example,
telemarketers made it seem as if they worked directly with or for Medicare, that the tests

would be beneficial to the beneficiaries, and that the targeted individuals were entitled to
the tests as a Medicare beneficiaries. The defendant heard recorded calls provided by
call centers that revealed these tactics.

The defendant also worked with O'Sullivan, King, and Shorr to set up an "in
house" call center at Tesis to make direct contact with beneficiaries to induce them to
participate in genetic testing. The defendant reviewed "scripts" for the call center
representatives to follow when speaking to target beneficiaries. The scripts included
false statements intended to induce the beneficiaries to agree to genetic testing,
including, for example, the assertion that genetic testing "could replace blood test for
heart failure and could be used to monitor heart failure. Early diagnosis of a heart attack
may now be possible by doing this test." The defendant, with King and O'Sullivan,
attempted to set up a call center space in New York, assigned a Tesis employee to
work on call center tasks and make calls to, and attempted to generate revenue through
direct beneficiary inducement to genetic testing. The Tesis in-house call center project
ultimately was not successful.

> *(2) The defendant knowingly and willfully caused the submission of medically
> unnecessary claims to Medicare that contained false diagnosis codes for tests
> that were not intended to be used to diagnose or treat beneficiaries.*

The defendant participated in setting up a fraudulent business model through
which medically unnecessary genetic tests were ordered based on false diagnosis
codes included in manufactured doctors' orders that bore no relationship to the
beneficiaries' diagnosis or treatment.

The defendant knew and trained others on Medicare's medical necessity

requirements for laboratory tests, including as stated in one of Billing Company's training documents, that "Laboratory tests must be ordered by the physician or NPP who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in management of the beneficiary's specific medical problem." Nevertheless, the defendant directed and knew others at Tesis directed marketers to obtain signed doctors' orders from physicians who did not meet these requirements, including through telemedicine and through a process called "doctor chase," or "doc chase." In the doc chase model, call center representatives induced the beneficiary to identify their primary care physician, and the marketer "chased" the physician and made false and fraudulent representations to induce the physician to sign off on prepopulated requisition forms transmitted to the doctors' offices.

Both processes involved untrained, nonmedical call center representatives collecting personal health information directly from beneficiaries via telephone to create facial justification for the tests. As noted, the defendant provided and directed Billing Company employees to provide "medical necessity" training to the marketers. This training informed the marketers which diagnosis codes (ICD-10 codes) had to appear on the doctor's signed genetic testing requisition forms for the Billing Company to approve the test. The defendant knew that call centers used non-medical telemarketing representatives to ask elderly persons about their personal health symptoms and conditions in order for the telemarketers to assign "diagnoses" from the Billing Company's medical necessity training to the beneficiaries. The personal health

information telemarketers solicited was used to identify "diagnoses" to be entered onto the doctor's order (requisition form)—to be signed off on through the telemedicine or doctor chase process—and to be included on the claims submitted to Medicare and Colorado Medicaid to obtain payment for the tests.

After call centers solicited the beneficiaries through the call center process, providers had to sign the orders for Tesis to be able to run the test and submit claims. Tesis paid marketers to obtain signatures on test requisition forms for tests that were not ordered for purposes of diagnosis or treatment through both the telemedicine and doctor case process.

The defendant and her co-conspirators directed and caused marketers to use telemedicine companies they approved to obtain doctors' orders for medically unnecessary genetic tests. The telemedicine providers used personal health information solicited by telemarketers from the beneficiary and a brief telephonic call with the beneficiary as the basis for signing the test requisition form containing the diagnosis codes the telemarketers identified. The defendant knew that the ordering providers never examined the beneficiaries, typically spoke to each beneficiary over the phone for only a few minutes, relied on beneficiaries' self-reported medical information solicited by telemarketers, did not treat or diagnose the beneficiaries with any medical conditions, and did not intend to, and did not use the genetic test results to treat or diagnose the beneficiaries. The tests derived from telemedicine were ordered primarily for the economic benefit of the co-conspirators and their associates. The defendant also knew

that marketing companies illegally paid the telehealth companies on a per-patient basis
for the orders.

The defendant also participated in procuring and knew her co-conspirators
procured and paid marketing companies to obtain doctors' orders for medically
unnecessary genetic tests through the doctor chase process. Beneficiaries' primary
care physicians were induced to sign requisition forms prepopulated with diagnosis
codes identified by the telemarketers based on representations to these providers, e.g.,
that the beneficiary had requested the test. These primary care physicians did not order
the test for purposes of diagnosing or treating the patients. The tests derived from the
doctor chase process were ordered primarily for the economic benefit of the co-
conspirators and their associates.

As identified above, the defendant and her co-conspirators used "medical
necessity" training for the marketers and the "rejection" and "correction" process to
obtain fraudulent doctors' orders that would enable and maximize payment to the Tesis
laboratories. When Billing Company employees rejected a signed doctors' order for
having "insufficient" medical necessity per the scrubbing process, the tracking and
correction process encouraged and caused marketers to "correct" signed doctors'
orders that the Billing Company "rejected" by seeking the addition of or changing
diagnosis codes on the already-submitted doctors' orders based solely on billing needs,
not the beneficiaries' actual medical conditions.

The defendant also knew that claims Tesis submitted were not for medically
necessary tests that a treating physician would order to diagnose or treat a beneficiary

because the tests were manufactured to maximize payment to Tesis and her co-

defendants, not for any legitimate medical purpose. The Tesis laboratories submitted

claims to Medicare and Colorado Medicaid for testing "panels" created by Billing

Company employees under the defendant and King's direction. These panels were

created and manipulated by a handful of Billing Company employees to maximize

reimbursement by Medicare. These employees had received medical billing coding

training but had no actual medical training or medical educational degrees. The

defendant and King directed employees to use the internet to look for genes associated

with billing codes with high reimbursement rates. These non-medical, coding employees

made their own judgments that online articles provided "clinical relevance" for the

association between a gene and a disease. The coding employee's internet searches

would then result in adding genes to the Tesis laboratory testing panels, which in turn

would add a billing code (CPT code) to the claim for the testing panel that would

increase payment to Tesis—and the cost to Medicare and Colorado Medicaid. The

Billing Company employees then "mapped" the CPT codes to diagnosis codes (ICD-10

codes) that the Tesis laboratories could use to facially justify the billing. Those diagnosis

codes were the codes provided to marketers in medical necessity training.

  *(3) The defendant caused the submission of claims based on illegal kickbacks.*

  The defendant knew that it was unlawful to procure genetic testing referrals

through the payment of kickbacks but caused the submission of claims to Medicare and

Colorado Medicaid in violation of the Antikickback Statute, as identified above. The

claims were also fraudulently submitted for this reason, because Medicare prohibited

payment for claims procured through the payment of kickbacks.

*Reference Testing Fraud*

In addition to billing Medicare and Colorado Medicaid directly, the defendants

agreed to increase revenue to the Tesis laboratories by completing "reference" testing.

Reference testing is when a laboratory (the "referring laboratory") sends a specimen for

testing to another laboratory (the "reference laboratory," Tesis), and the referring

laboratory bills Medicare for the service, not the reference laboratory. The referring

laboratory pays the reference laboratory for running the test, and the reference

laboratory knows the referring laboratory will file claims for payment for the test with

Medicare or other insurers.

The defendant, along with King, Roiter, and Shorr, agreed to have Tesis begin to

offer services as a reference laboratory. King and Edson agreed that Tesis needed to

increase revenue after the Tesis laboratories stopped accepting doctors' orders signed

by telehealth providers from the Tesis marketers in or around November 2021 and

began losing significant revenue as a result. To make up for the loss in revenue, King

suggested that Tesis's marketers who bought doctors' orders from telehealth providers

to sell to Tesis should instead sell their referrals to other laboratories that would bill

Medicare but for whom Tesis could run the tests as a reference laboratory. Tesis would

be paid for the testing services by the third-party referring laboratory but would not have

to directly bill Medicare for the claims. The defendant was aware of this plan. Knowing

that a third-party laboratory would bill Medicare for medically unnecessary genetic tests,

in or around May 2022, the co-conspirators agreed to have Tesis Arizona perform the

testing for which a third-party, Home Genetics Ltd., would submit claims, in exchange

for payment for the testing. Tesis knew Home Genetics Ltd. submitted claims for

fraudulent, medically unnecessary genetic tests because the owner of Home Genetics

Ltd. was a "marketer" for Tesis sold referrals to Tesis in exchange for kickbacks before

starting his own laboratory. The owner used telemedicine and call centers, through the

processes described above, both when he was a marketer for Tesis and when he was

the Home Genetics Ltd. owner. Billing Company contracted with Home Genetics Ltd. to

be their biller and to receive a portion of all Home Genetics Ltd. revenues (i.e.,

payments from Medicare and other insurers) in exchange. The defendant, through her

control of Billing Company, caused the submission of fraudulent claims for

reimbursement for the genetic tests for Home Genetics Ltd. Billing Company submitted

claims totaling $588,702 for fraudulent genetic testing claims, for which Medicare paid

Home Genetics $582,726.90.

As demonstrated through the facts alleged in the Indictment, the overt acts set

forth therein, and the stipulated facts in this Plea Agreement, the defendant and her co-

conspirators were interdependent with respect to the conspiracies to which the

defendant pleads.

The conspiracies charged resulted in payments from Medicare and Colorado

Medicaid to the Tesis laboratories and Home Genetics Ltd. totaling $50,044,359.02,

consisting of $1,378,039.22 paid to Tesis laboratories by Colorado Medicaid,

$48,083,522.90 paid to Tesis laboratories by Medicare, and $582,796.90 paid to Home
Genetics Ltd. by Medicare.

The defendant received payments of $3,068,200.29 as part of the conspiracies
as an owner of Tesis and the owner of Billing Company.

The defendant acknowledges and stipulates that the genetic tests ordered,
completed, and paid for by the health care programs, including Medicare and Colorado
Medicaid, were fraudulently obtained and submitted, not medically necessary, and were
submitted in violation of Medicare and Colorado Medicaid rules and regulations, as set
forth in the Indictment.

### *Money Laundering*

The defendant admits that she participated in laundering proceeds of the
kickback and health care fraud conspiracies, as charged in Count 3 of the Indictment,
which count the government agrees to dismiss pursuant to this Plea Agreement. To
funnel payments to herself, King, and Roiter, the defendant agreed to take "override"
payments from shell companies Roiter established in the name of his associates to
conceal the nature and source of the payments to her. The defendant, Roiter, and King
agreed falsely to identify payments to shell entities Roiter established as payments for
"marketing services." But, in fact, these payments were intended simply to pay
themselves; the defendant, Roiter, and King, provided no services in exchange for the
payments. The defendant, Roiter, and King caused payments for the "overrides" to be
issued from Tesis entity bank accounts to accounts in the name of the shell entities that
Roiter controlled. Roiter then distributed the funds from the shell entities for the benefit

of himself, King, and the defendant. In total, the defendant, King, and Roiter, laundered millions of dollars for their direct benefit.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. To aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters that are in dispute.

The guideline calculation below is the good-faith estimate of the parties, but it is only an estimate. The parties understand that the government has an independent obligation to assist the Court in making an accurate determination of the correct guideline range. To that end, the government may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

a)    Under § 2X1.1 (conspiracy) the application guideline is that for the substantive offense, plus any adjustments for such guideline. The substantive offenses group under § 3D1.2(d).

b)    The applicable guideline is § 2B1.1. The base offense level is 6. Twenty-two offense levels are added because the fraud loss was more than $25 million and less than $65 million. *Id.* § 2B1.1(b)(1)(L).

c)    Two levels are added because the health care fraud conspiracy was committed through mass marketing. *Id.* § 2B1.1(b)(2)(A).

d)    Four levels are added because the defendant is convicted of a federal
health care offense involving a government health care program for which
the loss is more than $20 million. *Id.* § 2B1.1(b)(7).

e)    Two levels are added because a substantial part of the fraudulent scheme
was committed outside the United States and because the offense
otherwise involved sophisticated means. *Id.* § 2B1.1(b)(10)(B) and (C).

f)    The adjusted offense level with these enhancements is **36**. The
government anticipates arguing that an aggravating role enhancement
under § 3B1.1(b) applies. If it does, the adjusted offense level is **39**. The
defendant reserves the right to argue at sentencing that no aggravating
role enhancement applies. If there is no adjustment under § 3B1.1, the
adjusted offense level is **36**. The government reserves the right to make
argument and present evidence to support its position at sentencing.

g)    If, pursuant to the defendant's position, there is no aggravating role
enhancement, the zero-point offender adjustment under § 4C1.1 would
apply, and the adjusted offense level after this deduction would be **34**. If
the aggravating role enhancement applies, the zero-point offender
adjustment does not apply, and the adjusted offense level is still **39**.

h)    The defendant should receive a two-level deduction for acceptance of
responsibility, *id.* § 3E1.1(a), and should the defendant comply with the
terms of the plea agreement regarding acceptance of responsibility, an
additional one-point deduction for timely notification of her intention to
plead guilty, *id.* § 3E1.1(b).

i)    The resulting adjusted offense level after acceptance is **31** pursuant to the
defendant's position and **36** pursuant to the government's position.

j)    The parties understand that the defendant's criminal history computation
is tentative and based on the defendant's prior convictions. The parties
believe the defendant is in criminal history category I.

k)    The career offender/criminal livelihood/armed career criminal adjustments
do not apply.

l)    The resulting advisory guideline range pursuant to the defendant's
position is **108 to 135 months** of imprisonment. The resulting advisory
guideline range pursuant to the government's position is **188 to 235**
months of imprisonment. However, the maximum statutory sentence for
Count 1 is ten years (120 months) of imprisonment, and the maximum

statutory sentence on Count 2 is five years (60 months) of imprisonment. The statutorily authorized maximum sentence, therefore, is 15 years, or **180 months** of imprisonment, *id.* § 5G1.1(c)(1), and this is the guideline sentence under the government's calculation. The U.S. Sentencing Guidelines provide, and it is the government's position that, the sentence on the two counts should run consecutively to the extent necessary to produce a combined sentence equal to the total punishment. *Id.* § 5G1.2(d).

m)    Pursuant to § 5E1.1, the Court must enter a restitution order. The parties' positions regarding restitution are set forth above.

n)    Pursuant to § 5E1.2, assuming the estimated offense levels above are correct, the fine range pursuant to the defendant's calculation is $30,000 to $300,000, plus applicable interest and penalties, and the fine range pursuant to the government's calculation is $40,000 to $400,000, plus applicable interest and penalties.

o)    Pursuant to § 5D1.2(a)(2), if the Court imposes a term of supervised release, that term is at least one year but not more than 3 years.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.    ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor

the defendant has relied, or is relying, on any other terms, promises, conditions, or assurances.

Date: 4-16-25

Tina Wellman
Defendant

Date: 4/16/2025

Emmett Matthew Leeper, III
Attorney for Defendant

Date: 4/16/25

Anna Edgar
Assistant U.S. Attorney